## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| AVENGER FLIGHT GROUP, LLC, *et al.*,[1] | Case No. 26-10183 (___) |
| Debtors. | (Joint Administration Requested) |

### MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS UNDER BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, 364, 503, 506, 507, AND 552 AND BANKRUPTCY RULES 2002, 4001, 6003, 6004, AND 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state as follows in support of this motion (the "<u>Motion</u>"):[2]

### Relief Requested

1.      The Debtors file this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy</u>

---

[1]      The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Avenger Flight Group, LLC (1216); AFG Dallas III, LLC (5615); AFG Dallas IV, LLC (5558); AFG Dallas, LLC (3418); AFG EU Operations Corp. (9406); AFG FLL, LLC (6470); AFG Latam Holding Corp. (6475); AFG Latam Sim Holdings II, LLC (0473); AFG Latam Sim Holdings III, LLC (2592); AFG Latam Sim Holdings IV, LLC (0093); AFG Latam Sim Holdings, LLC (6475); AFG Latam, LLC (9545); AFG Mexico Corp. (1402); AFG Orlando, LLC (8409); AFG Sanford, LLC (6661); AFG Sim Holding Corp. (3325); Avenger Flight Group Europe, Corp. (5908); Avenger Flight Group Topco, LLC (5643); Avenger Flight Training, LLC (5640); Avenger Flight Group Mexico II, S. de R.L. de C.V, (N/A); and Papi Flight Training, LLC (6206).  The location of the Debtors' corporate headquarters and the Debtors' service address is Avenger Flight Group, LLC, 1450 Lee Wagener Blvd., Fort Lauderdale, FL 33315.

[2]      A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Lawrence Perkins in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "<u>First Day Declaration</u>").

Rules"), and Rules 2002-1(b), 4001-2, 9006-1, and 9013-1(m) of the Local Rules of the United

States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of interim

and final orders, substantially in the form of the interim order attached hereto as **Exhibit 1** and a

final order to be submitted at a later date (respectively, the "Interim Order" and "Final Order" and

collectively, the "DIP Orders"):

    a.    authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis (the "DIP Facility" and the loans thereunder, the "DIP Loans") consisting of:

        i.    a new money multiple draw term loan facility in the aggregate principal amount of $14,500,000 consisting of (A) up to $8,000,000 in the form of a DIP Loan to be made available to the Debtors in one or more draws upon entry of the Interim Order (the "Interim Amount"), and (B) up to an additional $6,500,000 in the form of a DIP Loan to be made available in one or more draws upon entry of the Final Order (the "Final Amount" and together with the Interim Amount, the "New Money Amount"), and

        ii.    (x) immediately upon entry of the Interim Order, a deemed "roll-up" on a cashless basis of $6,000,000 of the Bridge Loan Obligations (as defined below) held by the DIP Lenders (as defined below) (or their affiliates) on a *pro rata* basis according to their DIP Term Loan Commitments (as defined below), in each case, to be deemed incurred as of the date of entry of the Interim Order, and (y) immediately upon entry of the Final Order, a deemed "roll-up" on a cashless basis of an additional $23,000,000 of the Prepetition Term Loan Obligations (as defined below) held by the DIP Lenders (or their affiliates) on a *pro rata* basis according to their DIP Term Loan Commitments, in each case, to be deemed incurred as of the date of entry of the Final Order,

in each case, pursuant to the terms and conditions of the Interim Order, the Final Order, the Approved Budget (as defined below), and that certain term sheet attached as Exhibit A to the Interim Order (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Term Sheet")[3] by and among Avenger Flight Group, LLC, as borrower, the Guarantors, Wilmington Trust, National Association, as administrative and collateral agent (in such capacity, the "DIP Agent"), and the lenders party thereto from time to time (the "DIP Lenders" and together with the DIP Agent, the "DIP Secured Parties");

    b.    approving the terms of and authorizing the Debtors to execute and deliver the DIP Term Sheet and any other agreements, instruments, and documents related thereto

---

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Term Sheet or the First Day Declaration, as applicable.

(the "<u>DIP Documents</u>"), which shall be on terms consistent with the terms set forth in the DIP Term Sheet and otherwise in form and substance acceptable to the Required DIP Lenders (as defined below) (or as otherwise provided in the DIP Term Sheet) and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

c.    authorizing the Debtors to enter into the DIP Term Sheet and to incur all obligations owing thereunder and under the DIP Documents to the DIP Secured Parties, including the Roll-Up Obligations (as defined below) (collectively, the "<u>DIP Obligations</u>"), and granting the DIP Agent and DIP Lenders allowed superpriority administrative expense claim status in each of these chapter 11 cases and any Successor Cases (as defined below), subject to the Carve-Out (as defined below);

d.    granting to the DIP Agent (on behalf of the DIP Secured Parties) automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date) or any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Term Loan Collateral or otherwise (together, "<u>Cash Collateral</u>"), which liens shall be in accordance with the relative priorities set forth in <u>Exhibit C</u> to the Interim Order;

e.    authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral to:

    i.    provide financing for working capital and other general corporate purposes, including for bankruptcy-related costs and expenses, all to the extent provided in, and in accordance with, the Approved Budget, the DIP Orders, and the DIP Documents;

    ii.    make permitted adequate protection payments as specified below;

    iii.    pay the principal, interest, fees, expenses, and other amounts payable and reimbursable under the DIP Documents or the DIP Orders as such become due, including, without limitation, the DIP Financing Fees (as defined below) and the fees and disbursements of the DIP Professionals (as defined in the Interim Order); and

    iv.    any other purpose agreed upon in the DIP Documents, in each case solely in accordance with the Approved Budget, the DIP Orders, and the DIP Documents;

f.    authorizing the Debtors to use the Prepetition Term Loan Collateral, including the Cash Collateral on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition Term Loan Secured Parties (as defined below) for any Diminution

of their interests in the Prepetition Term Loan Collateral, including the Cash Collateral;

g.    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders;

h.    authorizing the DIP Agent, at the direction of the DIP Lenders holding, in aggregate, a majority in principal amount of the outstanding DIP Loans and unfunded DIP Term Loan Commitments (the "Required DIP Lenders") (or as otherwise provided in the DIP Documents), upon the occurrence of an Event of Default, to:

    i.   terminate the funding obligations under the DIP Documents;

    ii.  declare the DIP Obligations to be immediately due and payable in full, in accordance with the DIP Orders; and

    iii. subject to the DIP Orders, be granted relief from the automatic stay to foreclose on the DIP Liens and DIP Collateral;

i.    approving certain stipulations in paragraph G of the Interim Order by the Debtors with respect to the Prepetition Term Loan Documents (as defined below) and the liens and security interests arising therefrom subject to the Challenge Period described in paragraph 44 of the Interim Order;

j.    authorizing payment of the DIP Fees (as defined in the Interim Order);

k.    waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the DIP Orders and providing for the immediate effectiveness thereof;

l.    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing; and

m.   granting related relief.

2.    In further support of this Motion, the Debtors submit the First Day Declaration, which contains specific facts regarding the Debtors' need for the DIP Facility, access to Cash Collateral, and the lack of any available financing alternatives.

## Jurisdiction and Venue

3.    The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy

Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1(b), 4001-2, 9006-1, and 9013-1(m).

## Background

### A.      General Background

6.      On February 11, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

7.      Avenger Flight Group, LLC and its affiliates (collectively, "Avenger" or the "Company") is a global leader in the commercial aviation simulation and training business. Avenger provides a full suite of advanced flight simulator training solutions to their customers,

which include blue-chip passenger airlines, regional airlines, charter operators, and training operators.  As of the Petition Date, the Company owns, operates or services 50 full-flight simulators and 15 flight training devices across 11 training centers in 4 countries.

**B.**     **Prepetition Secured Obligations**

8.     **Prepetition Term Loan Facility**.  Pursuant to that certain Credit Agreement, dated as of June 25, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement" and collectively with all other agreements, instruments, and documents executed or delivered in connection therewith, each as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Term Loan Documents"), by and among, *inter alia*, Debtor Avenger Flight Group, LLC, Avenger Flight Group Topco, LLC ("Holdings"), together with certain subsidiaries of Holdings, as guarantors, the lenders from time to time party thereto (the "Prepetition Term Loan Lenders"), and Wilmington Trust, National Association, as Administrative Agent and Collateral Agent (the "Prepetition Term Loan Agent" and together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan Secured Parties"), the Prepetition Term Loan Lenders provided a secured term loan facility to the Debtors (the "Prepetition Term Loan Facility").

9.     **Prepetition Term Loan Obligations**.  As of the Petition Date, the Credit Parties (as defined in the Prepetition Credit Agreement) were indebted and jointly and severally liable to the Prepetition Term Loan Secured Parties in the aggregate principal amount outstanding under the Prepetition Term Loan Facility of not less than $273,051,488.11 (together with accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts, and

costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations in connection with the Prepetition Term Loan Facility pursuant to the Prepetition Term Loan Documents, the "<u>Prepetition Term Loan Obligations</u>").   Specifically, the Prepetition Term Loan Facility consists of (a) First Out Term Loans in an aggregate principal amount of not less than $149,275,017.35 (together with all accrued and unpaid interest, fees, expenses and other amounts and obligations), (b) Sixteenth Amendment Incremental Term Loans in an aggregate principal amount of not less than $2,208,720.84 (together with all accrued and unpaid interest, fees, expenses and other amounts and obligations) and (c) Second Out Term Loans in an aggregate principal amount of not less than $121,567,749.92 (together with all accrued and unpaid interest, fees, expenses and other amounts and obligations) (collectively, the "<u>Prepetition Term Loans</u>").  The Prepetition Term Loans include not less than $8,013,535.57 in principal amount outstanding as of the Petition Date of bridge financing provided in September and December 2025 (together with all accrued and unpaid interest, fees, expenses and other amounts and obligations) (collectively, the "<u>Bridge Loan Obligations</u>").

10.     **Prepetition Term Loan Liens and Prepetition Term Loan Collateral**.  As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition Date, the Credit Parties (as defined in the Prepetition Credit Agreement) granted to the Prepetition Term Loan Agent for the benefit of the Prepetition Term Loan Secured Parties a security interest in and continuing lien (the "<u>Prepetition Term Loan Liens</u>") on all Collateral (as defined in the Prepetition Term Loan Documents) (including Cash Collateral) and all proceeds, products, accessions, rents, and profits

thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition Term Loan Collateral").[4]

11.     **EDC Facility**.  Without acknowledging the validity, priority, enforceability, extent, or allowance of such claims and liens, the Debtors make reference to:   (i) that certain Loan Agreement, dated as of November 1, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "EDC LATAM Loan Agreement" and collectively with all other agreements, instruments, and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "EDC LATAM Loan Documents"), among AFG LATAM Sim Holdings, LLC, a Florida limited liability company ("LATAM"), Export Development Canada, a corporation established by an Act of Parliament of Canada ("EDC"), as loan agent for the lenders (in such capacity, the "EDC Loan Agent"), as a lender (in such capacity, an "EDC Lender"), and as security trustee (in such capacity, the "EDC Security Trustee" and together with the EDC Loan Agent and EDC Lender, the "EDC Secured Parties"); and (ii) that certain Loan Agreement, dated as of July 11, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "EDC LATAM IV Loan Agreement" and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "EDC LATAM IV Loan Documents"), among AFG LATAM

---

[4]   The Prepetition Term Loan Collateral includes the CAE Inc. A320 flight simulator unit bearing manufacturer's serial number 115493 and all other Collateral (as defined in the Prepetition Term Loan Documents) owned by Debtor AFG SIM Holdings II, LLC.

Sim Holdings IV, LLC, a Florida limited liability company ("LATAM IV") and the EDC Secured Parties.

12.     Pursuant to the EDC LATAM Loan Documents, the EDC Secured Parties provided loans to certain of the Debtors for the purchase of one TRU Simulation + Training Canada Inc. A320 flight simulator unit bearing manufacturer's serial number SN-00002635 and certain related assets (the "EDC LATAM Facility"), and the EDC LATAM Facility is purportedly secured by such assets and certain other related assets, including the equity interests of LATAM, substantially all assets of LATAM, and the rights and interests of LATAM and certain of its subsidiaries in certain leases and subleases related to such assets (collectively, the "EDC LATAM Collateral").  Pursuant to the EDC LATAM IV Loan Documents, the EDC Secured Parties provided loans to the Debtors for the purchase of one TRU Simulation + Training Canada Inc. A320 flight simulator unit bearing manufacturer's serial number SN-00002659 and certain related assets (the "EDC LATAM IV Facility"), and the EDC LATAM IV Facility is purportedly secured by such assets and certain other related assets, including the equity interests of LATAM IV, substantially all assets of LATAM IV, and the rights and interests of LATAM IV and certain of its subsidiaries in certain leases and subleases related to such assets (collectively, the "EDC LATAM IV Collateral" and together with EDC LATAM Collateral, the "EDC Collateral" and the liens and security interests purportedly granted thereon in favor of the EDC Secured Parties, the "EDC Liens").[5]

---

[5]   The DIP Secured Parties, the Prepetition Secured Parties, and the Debtors each expressly reserve all rights, claims, defenses, and causes of action with respect to the existence, validity, priority, perfection, extent, enforceability, and avoidability of any liens, security interests, or other interests that any of the EDC Secured Parties may purport to hold in any property or assets of the Debtors, including the EDC Collateral and any proceeds or products thereof, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise.

**Proposed DIP Facility**

13.     As set forth in the First Day Declaration, the Debtors have limited liquidity to continue business in the ordinary course and satisfy administrative expenses.  The Debtors require debtor-in-possession financing and use of Cash Collateral to fund their proposed sale process and ensure the administrative solvency of their estates.  Absent the funding available under the DIP Facility and immediate access to Cash Collateral, the Debtors would be unable to sustain operations, pay their employees or vendors, or achieve a successful restructuring through the chapter 11 process.  Accordingly, the Debtors have an urgent and immediate need for entry of the Interim Order as requested herein.

14.     The Debtors negotiated with the DIP Lenders and Prepetition Term Loan Lenders to develop a 13-week budget approved by the Required DIP Lenders, which sets forth, among other things, projected cash receipts and cash disbursements (the "Approved Budget"), a copy of which is attached as Exhibit B to the Interim Order, as well as a sale timeline that would induce the DIP Lenders to commit to the DIP Facility and the Prepetition Term Loan Lenders to consent to the use of Cash Collateral in light of the Debtors' circumstances.  After good faith and arms' length negotiations, the Debtors and the DIP Lenders and Prepetition Term Loan Lenders ultimately agreed on the terms of the DIP Facility and consensual use of Cash Collateral.

15.     The Debtors believe that the financing available under the DIP Facility, along with consensual access to Cash Collateral, all in accordance with the projections in the Approved Budget, will allow the Debtors to have adequate liquidity to satisfy their accruing administrative expenses during the course of these chapter 11 cases while they pursue a value-maximizing sale of their assets.  The Debtors further believe that the terms of the proposed financing are reasonable, appropriate, and consistent with market terms for comparable financing facilities.

A.      **Financing Efforts**

16.      The Debtors exercised their business judgment in the selection and negotiation of the DIP Facility.  Prior to the Petition Date, the Debtors' advisors prepared a teaser describing the DIP loan opportunity and approached various alternative funding sources.  None of these potential third party lenders were prepared to offer debtor in possession financing to the Debtors, particularly on a junior basis to the existing Prepetition Term Loan Obligations.

17.      The Debtors therefore engaged in good faith, arms-length negotiations with the DIP Lenders and Prepetition Term Loan Lenders regarding the proposed terms of the DIP Facility and use of Cash Collateral.

18.      The proposed DIP Facility and the authorization to use Cash Collateral as offered by the DIP Lenders and Prepetition Term Loan Lenders are the best financing options that the Debtors could obtain under the circumstances.  Fully unsecured postpetition financing was not available to the Debtors, and other potential sources of debtor-in-possession financing, including on a junior secured basis, were also unavailable.

19.      The Debtors believe that it is essential to the success of their chapter 11 cases, and the culmination of their sale process, that the Debtors receive immediate authority to access the DIP Facility and use Cash Collateral.

B.      **Summary of Essential Terms of DIP Facility**

20.      In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2(a)(i)–(iii), below is a summary[6] of the essential terms of the proposed financing and use of cash collateral and the location of the same in the proposed Interim Order or the DIP Term Sheet:

---

[6]      The summary and descriptions of the terms and conditions for the proposed financing and use of cash collateral and the provisions of the Interim Order and the Final Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof.  The summaries and descriptions are qualified in their entirety by the Interim Order, the Final Order, and

| | |
|---|---|
| **Borrower:** | Avenger Flight Group, LLC, as debtor and debtor-in-possession under the Bankruptcy Code. |
| **Guarantors:** | Each of (a) the other Credit Parties (as defined in the Prepetition Credit Agreement), (b) any other subsidiary or affiliate of the Borrower that has commenced a bankruptcy case related to these chapter 11 cases, and (c) any other subsidiary of the Borrower, currently party to the Prepetition Credit Agreement (collectively, the "<u>Guarantors</u>" and together with the Borrower, the "<u>DIP Loan Parties</u>").[7] |
| **DIP Lenders:** | The Prepetition Term Loan Lenders who elect to provide DIP Term Loan Commitments shall be the "<u>DIP Lenders</u>."  All Prepetition Term Loan Lenders (or their affiliates) were offered the right to participate in the DIP Facility *pro rata* with their holdings under the Prepetition Credit Agreement. |
| **DIP Agent:** | Wilmington Trust, National Association shall be the "<u>DIP Agent</u>" (together with the DIP Lenders, the "<u>DIP Secured Parties</u>").<br><br>In connection with the DIP Documents or the DIP Term Sheet, as applicable, the DIP Agent shall be entitled to all of the rights, protections, immunities, and indemnities set forth in <u>Exhibit C</u> to the DIP Term Sheet.<br><br>The DIP Agent may be removed or replaced in accordance with the terms set forth in Section 1.5 of <u>Exhibit C</u> to the DIP Term Sheet. |
| **DIP Facility:** | A senior secured superpriority debtor-in-possession multi-draw term loan credit facility (the "<u>DIP Facility</u>" and the obligations thereunder, the "<u>DIP Obligations</u>"), consisting of (a) new money commitments in an aggregate principal amount of up to $14,500,000 (the "<u>DIP Term Loan Commitments</u>" and the loans pursuant thereto, the "<u>DIP Term Loans</u>"), of which up to $8,000,000 of the DIP Term Loan Commitments may be funded upon or following entry of the Interim Order approving the DIP Facility, which order shall be satisfactory to the Required DIP Lenders, and the remainder of the DIP Term Loan Commitments becoming available upon or following entry of the Final Order approving the DIP Facility, which order shall be satisfactory to the Required DIP Lenders, (b) immediately upon entry of the Interim Order, a deemed "roll-up" on a cashless basis of $6,000,000 of the Bridge Loans held by the DIP Lenders (or their affiliates) on a *pro rata* basis according to their DIP Term Loan Commitments, in each case, to be deemed incurred as of the date of entry of the Interim Order (the "<u>Interim Roll-Up Loans</u>" and the obligations thereunder, the "<u>Interim Roll-Up Obligations</u>"), and (c) immediately upon entry of the Final Order, a deemed "roll-up" on a cashless basis of an additional $23,000,000 of the Prepetition Term Loans held by the DIP Lenders (or their affiliates) on a *pro* |

---

the DIP Documents.  In the event there is any conflict between this Motion and the Interim Order, the Final Order, or the DIP Documents, the Interim Order, the Final Order, or the DIP Documents will control, as applicable.

[7]  The Guarantors shall include:  Avenger Flight Group Topco, LLC, AFG Dallas, LLC, AFG Dallas III, LLC, AFG Dallas IV, LLC, AFG Orlando, LLC, AFG Sanford, LLC, Avenger Flight Training, LLC, PAPI Flight Training, LLC, AFG FLL, LLC, AFG Sim Holding Corp., AFG EU Operations Corp., Avenger Flight Group Europe, Corp., AFG LATAM Holding Corp., AFG Latam SIM Holdings, LLC, AFG Latam SIM Holding III, LLC, AFG Latam SIM Holdings IV, LLC, AFG Mexico Corp., Avenger Flight Group Mexico II, S. de R.L. de C.V., AFG Latam, LLC, and AFG Latam SIM Holdings II, LLC.

| | |
|---|---|
| | *rata* basis according to their DIP Term Loan Commitments, in each case, to be deemed incurred as of the date of entry of the Final Order (the "<u>Final Roll-Up Loans</u>" and together with the Interim Roll-Up Loans, the "<u>Roll-Up Loans</u>" and the obligations thereunder, the "<u>Final Roll-Up Obligations</u>" and together with the Interim Roll-Up Obligations, the "<u>Roll-Up Obligations</u>"); the Roll-Up Loans, collectively with the DIP Term Loans, the "<u>DIP Loans</u>"); *provided* that after giving effect to the principal balance of all DIP Term Loans, the aggregate principal balance of all DIP Term Loans shall not exceed the DIP Term Loan Commitment; *provided, further*, that no DIP Lender shall be obligated to make DIP Term Loans in an amount in excess of the portion of the DIP Term Loan Commitment set forth next to such DIP Lender's name in the table set forth on <u>Exhibit A</u> to the DIP Term Sheet.<br><br>The deemed proceeds of the Roll-Up Loans shall be applied on a cashless, dollar-for-dollar basis to refinance, exchange, and replace an amount of the Prepetition Term Loans held by the DIP Lenders (or their affiliates), with such refinancing occurring in the following order of priority: (i) *first*, to Obligations due in respect of the Sixteenth Amendment Incremental Term Loans, (ii) *second*, to Obligations due in respect of the Fifteenth Amendment Incremental Term Loans, (iii) *third*, to Obligations due in respect of the remaining First Out Term Loans, and (iv) *finally*, to Obligations due in respect of the Second Out Term Loans, in each of (i) through (iv) first to Obligations constituting accrued and unpaid interest and then to Obligations constituting unpaid principal.<br><br>The proceeds of the DIP Term Loans shall be funded into a deposit account of the Borrower.  Such account shall be subject to the DIP Liens in favor of the DIP Agent, which shall be automatically perfected pursuant to the DIP Orders and shall be subject to a deposit account control agreement satisfactory to the DIP Agent if required by the DIP Agent (at the direction of the Required DIP Lenders).<br><br>DIP Term Sheet at 2–3. |
| **DIP Roll-Up Obligations:** | As set forth above, the Interim Roll-Up Loans will be rolled up upon entry of the Interim Order and the Final Roll-Up Loans will be rolled up upon entry of the Final Order. The aggregate total of the Roll-Up Loans will be $29,000,000.<br><br>DIP Term Sheet at 2–3. |
| **Fees and Expenses; Indemnity:** | (i) An upfront fee of 2.00% on the principal amount of the DIP Term Loan Commitments (the "<u>Upfront Fee</u>") payable in kind; and (ii) an exit fee of 2.00% on the principal amount of the DIP Term Loan Commitments, payable on the Maturity Date, payable in kind (the "<u>Exit Fee</u>" and, together with the Upfront Fee, the "<u>DIP Financing Fees</u>").  The Borrower shall also pay to the DIP Agent, for its own account, the fees (the "<u>Agency Fees</u>") in the amounts and at the times set forth in that certain agency fee letter, dated as of the date thereof, between the Borrower and the DIP Agent.  The Upfront Fee and the Agency Fees shall be fully earned upon entry of the Interim Order and approval of the Exit Fee is subject to entry of the Final Order.  The DIP Financing Fees shall be payable to each DIP Lender ratably.<br><br>The Debtors shall reimburse the DIP Agent and the DIP Lenders for reasonable and documented fees, costs, and expenses incurred in connection with the DIP |

|  | Facility and these chapter 11 cases, including, without limitation, the reasonable and documented fees, costs, and expenses of (a) counsel to the DIP Agent (limited to one lead counsel and one local counsel), (b) counsel to the DIP Lenders (limited to one lead counsel and one local counsel for the DIP Lenders taken as a whole), (c) one financial advisor to the DIP Lenders taken as a whole, and (d) specialty or local counsel to the DIP Lenders taken as a whole in each relevant jurisdiction, whether incurred on a prepetition or postpetition basis, which shall be payable by Borrower within 14 days after notice thereof absent objection and without the requirement for Court approval.  A copy of the summary invoice shall be provided to counsel to the Debtors, the Office of the United States Trustee (the "U.S. Trustee"), and counsel to the Official Committee of Unsecured Creditors (the "Committee"), if any.

The Debtors shall indemnify and hold harmless the DIP Agent and each DIP Lender (and each of their respective directors, officers, members, employees, advisors, and agents) against any loss, liability, cost, or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction).

No DIP Financing Fees shall be earned on account of any of the Roll-Up Loans.

DIP Term Sheet at 9–10. |
| **Interest Rate:** | DIP Term Loans:  Term SOFR+ 9.00% per annum, compounded monthly, paid in kind.

Roll-Up Loans:  Term SOFR + 9.50% per annum, compounded monthly, paid in kind.

As soon as practicable after 10:00 a.m. (Eastern Standard Time) on each Interest Rate Determination Date, the DIP Agent shall determine (which determination shall, absent manifest error, be final, conclusive, and binding upon all parties) the interest rate that shall apply to each of the SOFR Loans for which an interest rate is then being determined and shall promptly give notice thereof in writing to the Borrower and each DIP Lender.

Interest payable shall be computed on the basis of a year of three hundred sixty (360) days, in each case for the actual number of days elapsed in the period during which it accrues.  In computing interest on any DIP Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan, as the case may be, shall be excluded; *provided*, if a Loan is repaid on the same day on which it is made, one (1) day's interest shall be paid on that Loan.

Interest on each DIP Loan shall accrue and shall be payable in kind by being capitalized to the principal balance of the DIP Loans on each Interest Payment Date. |

Upon the expiration of any Interest Period applicable to any SOFR Loan, such SOFR Loan shall automatically continue as a SOFR Loan.

"Business Day" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and when used in connection with a SOFR Loan, shall also be a U.S. Government Securities Business Day.

"Floor" means a rate of interest equal to 1.00%.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank and any group or body charged with setting financial accounting or regulatory capital rules or standards).

"Interest Payment Date" means (a) the last Business Day of each calendar month, commencing the first calendar month after entry of the Interim Order, and (b) the Maturity Date.

"Interest Period" means, in connection with a SOFR Loan, an interest period of one (1) month, commencing on the date the applicable DIP Loan is advanced or rolled-up in accordance with the DIP Orders; *provided*, that (i) the initial Interest Period for such SOFR Loan will run from the date the DIP Loan was made to the next succeeding Interest Payment Date, and each Interest Period thereafter will run for one (1) month, (ii) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day, (iii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (iv) of this definition, end on the last Business Day of a calendar month, and (iv) no Interest Period shall extend beyond the Maturity Date.

"Interest Rate Determination Date" means, with respect to any Interest Period, the date that is two (2) Business Days prior to the first day of such Interest Period.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Loan" means a DIP Loan that bears interest at a rate based on Term SOFR.

|  | "Term SOFR" means, for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; *provided, however*, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day; *provided, further*, that if Term SOFR as so determined shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.<br><br>"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the DIP Agent in its reasonable discretion).<br><br>"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.<br><br>"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday, or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.<br><br>DIP Term Sheet at 4–6. |
|---|---|
| **Use of Proceeds:** | Proceeds of the DIP Facility will be used in compliance with the terms of the Approved Budget: (a) to pay transaction costs, fees, and expenses which are incurred in connection with the DIP Facility; (b) to pay professional fees of the Debtors and their estates and the Committee, if any, in accordance with the Approved Budget; and (c) for working capital and other general corporate purposes of the Debtors, all subject to certain restrictions to be set forth in the Interim Order or Final Order, as applicable, and the DIP Documents.<br><br>The deemed proceeds of the Roll-Up Loans shall be used to refinance an equal amount on a cashless dollar-for-dollar basis of the Prepetition Term Loans held by the DIP Lenders (or their affiliates) reducing the amount of the "Obligations" (as defined under the Prepetition Credit Agreement) by such amount.<br><br>DIP Term Sheet at 14. |
| **Maturity Date:** | The earliest to occur of (a) the 90th day following the Petition Date, (b) the 30th day following the Petition Date if the Final Order has not been entered on or prior to such date, (c) the date a sale of all or substantially all of the assets of the Debtors is consummated, (d) the termination of the Asset Purchase Agreement for a material |

| | |
|---|---|
| | breach thereof by any seller thereunder without the prior written consent of the Required DIP Lenders, (e) the effective date of a plan of reorganization or liquidation, (f) entry of an order by the Court approving (i) a motion seeking conversion or dismissal of these chapter 11 cases or (ii) a motion seeking the appointment or election of a trustee, a responsible officer, or an examiner with enlarged powers relating to the operation of the Debtors' business, and (g) the date any or all of the DIP Obligations are accelerated in accordance with the DIP Orders.<br><br>DIP Term Sheet at 9. |
| **DIP Collateral:** | The DIP Secured Parties shall be granted, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition first-priority security interests and liens (the "<u>DIP Liens</u>") on DIP Collateral; *provided, however*, the DIP Liens shall be subject to liens senior by operation of law and otherwise permitted by the Prepetition Term Loan Documents (solely to the extent any such permitted liens (x) (1) were in existence on the Petition Date, (2) are valid, unavoidable, and properly perfected as of the Petition Date or perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, (3) are senior in priority to the Prepetition Term Loan Obligations, and (4) are permitted to be incurred as senior priority liens under the applicable Prepetition Term Loan Documents, or (y) are expressly identified on a schedule to the DIP Orders, the "<u>Prepetition Permitted Liens</u>") and shall be in accordance with the relative lien priorities set forth in <u>Exhibit C</u> to the DIP Orders (the "<u>Lien Priority Exhibit</u>").<br><br>"<u>DIP Collateral</u>" means all property of the Estates under section 541 of the Bankruptcy Code, including all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of the Debtors, including:  (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, service marks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions, and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) subject to entry of a Final Order providing for such relief, the proceeds of any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or applicable state law equivalents; (c) proceeds from the Debtors' exercise of rights under section 506(c) and 550 of the Bankruptcy Code; (d) all Prepetition Term Loan Collateral, (e) all EDC Collateral, (f) all property of the Debtors that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date, and (g) all proceeds from the sale, assignment, or other disposition of any leased real property. Notwithstanding the foregoing, DIP Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases) solely to the extent that |

| | |
|---|---|
| | the grant of a DIP Lien is prohibited or restricted by the terms of such real property lease or applicable nonbankruptcy law to attach to any such real property lease. |
| | Notwithstanding the foregoing, the DIP Liens shall not extend to, and the DIP Collateral shall not consist of, avoidance actions brought under chapter 5 of the Bankruptcy Code or applicable state law equivalents, but (subject to entry of the Final Order) shall include the proceeds therefrom ("Avoidance Proceeds"). |
| | For the avoidance of doubt, the DIP Liens shall prime and be senior to the liens of the Prepetition Term Loan Lenders.  The DIP Liens granted under section 364(d)(1) of the Bankruptcy Code shall not be *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject in each case only to the Carve-Out, the Prepetition Permitted Liens (if any), and the relative lien priorities set forth in the Lien Priority Exhibit. |
| | All DIP Obligations shall also constitute allowed superpriority administrative expense claims (the "Superpriority Claims") in these chapter 11 cases and shall have priority over all other claims and administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.  However, the Superpriority Claims shall be subject to the Carve-Out and shall not be payable from Avoidance Proceeds pending entry of the Final Order. |
| | The DIP Liens shall be effective and automatically perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements. Notwithstanding the foregoing, the DIP Loan Parties shall take all actions that may be reasonably necessary or desirable, or that the Required DIP Lenders or the DIP Agent may reasonably request, to maintain at all times the validity, perfection, enforceability, and priority of the security interests and liens of the DIP Agent in the DIP Collateral, or to enable the DIP Agent to protect, exercise, or enforce its rights hereunder, under the DIP Orders, and in the DIP Collateral. |
| | Interim Order ¶¶ 5–7. |
| **Adequate Protection:** | As adequate protection for any diminution of the Prepetition Term Loan Secured Parties' interest in the "Collateral" (as defined in the Prepetition Credit Agreement) including without limitation any diminution resulting from the subordination of existing liens to the DIP Liens or the Debtors' use of cash collateral pursuant to the DIP Orders, the Prepetition Term Loan Agent shall receive, for the benefit of the Prepetition Term Loan Secured Parties, the adequate protection granted to the Prepetition Term Loan Secured Parties:  (A) pursuant to the DIP Orders (which shall include, without limitation, (i) monthly payments of the reasonable fees, costs, and expenses of the Prepetition Term Loan Secured Parties (including professional fees), (ii) replacement liens on the DIP Collateral that shall be junior only to the liens as expressly set forth in the Lien Priority Exhibit, (iii) superpriority administrative expense claims with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code, other than the superpriority administrative expense claims of the DIP Secured Parties and the Carve-Out and which shall not be payable from Avoidance Proceeds pending entry of the Final Order, and (iv) subject to entry of the Final Order, an acknowledgement of the unconditional right to credit bid the |

| | |
|---|---|
| | Prepetition Term Loan Obligations as further set forth in the DIP Term Sheet); and (B) as otherwise required by the Court pursuant to sections 361, 507, 363(e), and 364(d)(1) of the Bankruptcy Code or otherwise.<br><br>Interim Order ¶ 14. |
| **Carve-Out / Professional Fee Reserve:** | The "Carve-Out" shall be, collectively: (a) all statutory fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee (the "U.S. Trustee") pursuant to 28 U.S.C. §1930(a), (b) all reasonable fees and expenses incurred by a trustee, if any, under section 726(b) of the Bankruptcy Code in an aggregate amount not exceeding $25,000, (c) subject in all cases to the Approved Budget (as defined below) and to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees, disbursements, costs, and expenses (including any restructuring, sale, success, or other transaction fee allowed and payable by the Debtors to Seabury Aviation Partners pursuant to that certain engagement letter dated December 19, 2025, and excluding any restructuring, sale, success, or other transaction fee of any other investment bankers or financial advisors retained by the Debtors or any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "UCC")) incurred by persons or firms retained by the Debtors or the UCC, if any, pursuant to section 327, 328, 363, or 1103 of the Bankruptcy Code at any time before or on the first business day following delivery by the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) of a Carve-Out Trigger Notice (as defined below), and (d) professional fees of the Debtors not to exceed $150,000 and professional fees of the UCC (if any) not to exceed $50,000, in each case incurred after the first business day following delivery by the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise.<br><br>On a weekly basis, budgeted fees, costs, and expenses of professionals retained by the Debtors and the Committee, if any, shall be funded into a segregated escrow account held in trust in an amount as set forth in the Approved Budget (the "Professional Fee Reserve"). Amounts funded into the Professional Fee Reserve shall be considered used by the Debtors at such time as they are deposited into the Professional Fee Reserve for distribution to professionals in accordance with orders of the Court and the Approved Budget. Any amounts remaining in the Professional Fee Reserve after payment of allowed fees and expenses in accordance with the Approved Budget shall be DIP Collateral.<br><br>"Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors' lead counsel, the U.S. Trustee, and lead counsel to the Committee (if any), which notice may only be delivered following the occurrence and during the continuation of an event of default under the DIP Facility.<br><br>Interim Order ¶ 35. |
| **Affirmative Covenants / DIP Milestones:** | Customary for transactions of this type including budget covenants, weekly reporting, and compliance with certain DIP Milestones. The DIP Milestones are detailed at Exhibit B to the DIP Term Sheet. |

| | |
|---|---|
| **Negative Covenants:** | Customary for transactions of this type including limitations on indebtedness, liens, guarantees, investments, fundamental changes, and affiliate transactions.<br><br>Interim Order ¶ 42. |
| **Mandatory Prepayments:** | Subject only to the application of proceeds of DIP Collateral in accordance with the relative lien priorities set forth in the Lien Priority Exhibit, the Debtors shall pay or prepay the DIP Loans and all other DIP Obligations (together with a cash reserve established by the DIP Agent to cover asserted contingent and indemnity obligations in an amount directed by the Required DIP Lenders) until such obligations are paid in full immediately (and upon at least (3) business days' prior written notice to the DIP Agent or such shorter notice as may be agreed by the DIP Agent in its reasonable discretion) as follows:<br><br>(i) 100% of the net cash proceeds of any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code (other than a Sale to the Stalking Horse Purchaser pursuant to the Asset Purchase Agreement) simultaneous with the consummation thereof, after funding the Carve-Out and reserving proceeds sufficient to pay (a) undisputed, accrued, unpaid, and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Budget, and (b) an amount negotiated in good faith by the Required DIP Lenders and the Debtors that is necessary to fund costs for the wind-down of the Debtors' bankruptcy estates following the closing of such sale or disposition of all or substantially all of Debtors' assets;<br><br>(ii) 100% of the net cash proceeds of any other sale or other disposition by any Debtor of any assets, in a single transaction or series of related transactions (except for (a) de minimis asset sales approved by an order of the Court that is in form and substance acceptable to the Required DIP Lenders, or (b) sale of goods or services in the ordinary course of business);<br><br>(iii) 100% of the net cash proceeds of all assets being sold or assigned pursuant to (a) that certain Purchase Agreement for B787 Simulator entered into on December 11, 2025 by and between Avenger Flight Group Israel Holdings Ltd. and El Al Israel Airlines Ltd. ("El Al"), (b) that certain Reimbursement Agreement Relating to the 787 Boeing Data and Other Licenses entered into as of December 11, 2025 by and between Avenger Flight Group, LLC and El Al, and (c) any other related agreement; and<br><br>(iv) 100% of the net cash proceeds of extraordinary receipts (including tax refunds, indemnity payments, and insurance proceeds not included as proceeds of asset dispositions but excluding sales tax receipts contemplated to be received by the Debtors as set forth in the Approved Budget) by the Debtors.<br><br>Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any extraordinary receipts, asset sales, or other proceeds described above shall be permitted without the prior written consent of the Required DIP Lenders. |

|  | Mandatory payments or prepayments and proceeds of DIP Collateral received by the Debtors outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the DIP Lenders), after giving effect to the Carve-Out, the relative lien priorities set forth in the Lien Priority Exhibit, and any other payments required pursuant to the DIP Orders: |
|  | (1) <u>first</u>, to pay all documented out-of-pocket expenses of the DIP Agent as permitted hereunder; |
|  | (2) <u>second</u>, to pay all documented out-of-pocket expenses of the DIP Lenders as permitted hereunder; |
|  | (3) <u>third</u>, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders holding DIP Term Loans; |
|  | (4) <u>fourth</u>, to repay any principal amounts outstanding in respect of the DIP Term Loans (including any amounts and interest that have been added to the principal balance); |
|  | (5) <u>fifth</u>, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders holding Roll-Up Loans; |
|  | (6) <u>sixth</u>, to repay any principal amounts outstanding in respect of the Roll-Up Loans (including any amounts and interest that have been added to the principal balance); |
|  | (7) <u>seventh</u>, all other amounts owing to the DIP Lenders and the DIP Agent; and |
|  | (8) <u>last</u>, the balance, if any, after all of the DIP Obligations have been paid in full, to the Borrower subject in all respects to the rights, liens, and claims of the Prepetition Term Loan Secured Parties. |
|  | Notwithstanding the forgoing, any prepayment made pursuant to romanette (ii) or (iii) above shall be applied to the Roll-Up Obligations or to the Prepetition Term Loan Obligations as determined by the Required DIP Lenders and pursuant to direction provided to the DIP Agent and/or the Prepetition Term Loan Agent, as applicable. |
|  | DIP Term Sheet at 15–17. |
| **Conditions Precedent:** | Customary for transactions of this type, including entry of the Interim Order or Final Order, as applicable, and execution of the DIP Documents. |
|  | DIP Term Sheet at 10–12. |
| **Events of Default:** | Each of following shall constitute an "<u>Event of Default</u>": |
|  | (i) the entry of an Interim Order or Final Order in form and substance that is not acceptable to the Required DIP Lenders; |

(ii)    failure by any Debtor to be in compliance in all respects with the provisions of the DIP Term Sheet, the DIP Documents, or the DIP Orders;

(iii)    the reversal, modification, amendment, stay, reconsideration, or vacatur (or any request therefor made by the Debtors) of a DIP Order, without the prior written consent of the Required DIP Lenders;

(iv)    failure of any of the Milestones to be satisfied by the Specified Deadline;

(v)    failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made;

(vi)    the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full in cash upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest, or other lien in these chapter 11 cases which is *pari passu* with or senior to the DIP Liens, excluding liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the Required DIP Lenders;

(vii)    the commencement of any action or the filing of any pleading by the Debtors or other person against the DIP Agent or any DIP Lender or any of their respective agents and employees to subordinate or avoid any liens granted in connection with the DIP Orders;

(viii)    (1) the Debtors file a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement, or otherwise modify any DIP Order, the DIP Documents, or the DIP Term Sheet or to disallow the DIP Obligations, in whole or in part; or (2) any material provision of the DIP Orders, the DIP Documents, or the DIP Term Sheet or any other order of the Court approving the Debtors' use of Cash Collateral, shall for any reason cease to be valid and binding (without the prior written consent of the Required DIP Lenders);

(ix)    the filing with the Court of a motion seeking approval of a sale under section 363 of the Bankruptcy Code (other than approval of a Sale pursuant to the terms of the Asset Purchase Agreement) or a plan of reorganization or liquidation in these chapter 11 cases that, in any such case, does not provide for indefeasible payment in full in cash to the DIP Agent and the DIP Lenders of the DIP Loans, the DIP Obligations, and all other amounts outstanding under the DIP Term Sheet, the DIP Documents, and the DIP Orders on closing of such sale or the effective date of such plan, without the prior written consent of the Required DIP Lenders;

(x)    the appointment in these chapter 11 cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the

| | |
|---|---|
| | business of the Debtors (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code); |
| | (xi) the granting of relief from the automatic stay by the Court to any other creditor or party in interest in these chapter 11 cases with respect to any portion of the DIP Collateral exceeding $150,000 in value in the aggregate without prior written consent of the Required DIP Lenders; |
| | (xii) the failure to pay principal, cash interest (subject to a three-business day grace period, solely with respect to cash interest), or other DIP Obligations in full when due, including, without limitation, on the Maturity Date; |
| | (xiii) the payment of, or application by the Debtors for authority to pay, any prepetition claim without prior written consent of the Required DIP Lenders other than amounts set forth in the Approved Budget (subject to any Permitted Variances); and |
| | (xiv) the failure to comply with the Approved Budget (subject to any Permitted Variances). |
| | DIP Term Sheet at 17–18. |
| **Remedies:** | Upon the occurrence and during the continuance of any Event of Default, subject to five days' notice to counsel to the Debtors during which the Debtors may seek an emergency hearing before the Court (the "Remedies Notice Period"), the DIP Agent may (and, at the direction of the Required DIP Lenders, shall) take all or any of the following actions without further order of or application to the Court, and notwithstanding the automatic stay: |
| | (a) declare all DIP Obligations (including principal of, and accrued interest on, any outstanding DIP Loans) to be immediately due and payable; |
| | (b) terminate any further commitment to lend to the Borrower; |
| | (c) exercise rights and remedies pursuant to the terms of the DIP Orders, or applicable law (including, without limitation, direct the Debtors (or file a motion in the name of the Debtors)), (i) to enforce the terms and provisions of the DIP Term Sheet or the other DIP Documents, (ii) to collect accounts receivable, without setoff by any account debtor, including to direct the Debtors to collect such account receivables for the benefit of the DIP Secured Parties, (iii) to sell or otherwise dispose of any or all of the DIP Collateral on terms and conditions reasonably acceptable to the Required DIP Lenders pursuant to sections 363, 365, and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct the Debtors (or file a motion in the name of the Debtors) to assume and assign any unexpired lease or executory contract included in the DIP Collateral to the Required DIP Lenders' designee(s) in accordance with and subject to section 365 of the Bankruptcy Code), and (iv) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process); *provided* that the Debtors shall take all action that is reasonably necessary to |

|  | cooperate with the DIP Agent in the DIP Agent's exercise of its rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Agent (at the direction of the Required DIP Lenders); or<br><br>(d) after the expiration of the Remedies Notice Period (unless otherwise prohibited by the Court during the Remedies Notice Period) and without further notice or further Court order and without seeking further relief from the automatic stay under section 362 of the Bankruptcy Code, the Debtors, at the election of the Required DIP Lenders, shall facilitate a strict foreclosure under UCC section 9-620 as adopted by New York by transferring ownership and title to the DIP Collateral (as may be specified by the DIP Agent at direction of Required DIP Lenders) in full or partial satisfaction of the DIP Obligations.<br><br>DIP Term Sheet at 18–19. |
|---|---|
| **363 Credit Bid:** | Subject to entry of the Final Order, the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Term Loan Agent (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement)) shall be permitted to credit bid, pursuant and subject to section 363(k) of the Bankruptcy Code or applicable law, the DIP Term Loans and any Prepetition Term Loans, as applicable, in connection with any sale or disposition of assets in these chapter 11 cases.<br><br>The Final Order shall provide that the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Term Loan Agent (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement)) shall be permitted to credit bid (pursuant to section 363(k) of the Bankruptcy Code or applicable law) the DIP Loans (including the Roll-Up Loans) and any Prepetition Term Loans (and any other applicable obligations) held by the DIP Lenders in connection with any sale or disposition of assets in the Chapter 11 Cases (including any deposit in connection with such sale) and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code.<br><br>Interim Order ¶ 40. |
| **Amendments and Waivers:** | No provision of the DIP Term Sheet or any other DIP Document may be amended other than by an instrument in writing signed by (i) the Required DIP Lenders and (ii) the Debtors.<br><br>Notwithstanding the foregoing, any amendment, consent, waiver, supplement, or modification to the DIP Term Sheet or any other DIP Documents that has the effect of (i) increasing the DIP Term Loan Commitments of any DIP Lender (other than as expressly provided herein), (ii) decreasing the amount of or postponing the payment of any scheduled principal, interest, or fees payable to any DIP Lender (other than as expressly provided herein), (iii) altering the pro rata nature of disbursements by or payments to DIP Lenders or the application of prepayments in the DIP Term Sheet, (iv) amending or modifying the definition of "Required DIP Lenders" or any provision of this section "Amendments and Waivers", (v) releasing all or substantially all of the Guarantors of the DIP Obligations, or (vi) releasing all or substantially all of the DIP Collateral other than in connection with a disposition approved by an order of the Court with the prior written consent of the Required DIP |

| | |
|---|---|
| | Lenders, in each case, shall require the written consent of each DIP Lender directly and adversely affected thereby.<br><br>DIP Term Sheet at 20. |
| **Other Terms and Waivers:** | Other customary terms for a DIP facility of this type, including customary stipulations, waivers, and releases subject to standard challenge provisions.<br><br>The Committee's investigation budget is $25,000.<br><br>Surcharge, marshaling, and equities of the case waivers are subject to entry of the Final Order.<br><br>Interim Order ¶¶ 35(i), 47–49. |

## C.    <u>Additional Required Disclosures</u>

21.    Pursuant to Local Rule 4001-2(a)(i), a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing.  The debtor in possession must also justify the inclusion of certain such provisions.  Set forth below are the disclosures required in accordance with Local Rule 4001-2(a)(i)(A)–(X) (most of which are also disclosed in the summary above):

(i) Local Rule 4001-2(a)(i)(A) requires a debtor to disclose the amount of cash collateral the debtor seeks permission to use or the amount of credit the debtor seeks to obtain under the proposed loan agreement, including the committed amount of the proposed loan agreement and the amount of new funding that will actually be available for borrowing by the debtor.

**The amount of Cash Collateral to be used is set forth in the Approved Budget. The amount of the DIP Facility is set forth above and also in the Approved Budget.**

(ii) Local Rule 4001-2(a)(i)(B) requires the disclosure of pricing and economic terms, including letter of credit fees, commitment fees, and any other fees, provided that when any such terms are sought to be filed under seal, they shall not be disclosed in the Financing Motion itself, but shall be set forth in a separate document filed pursuant to the procedures set forth in Local Rule 9018-1(d), the filing of which shall be disclosed in the Financing Motion.

**The economic terms of the DIP Facility and the applicable paragraphs of the proposed Interim Order and DIP Term Sheet, as applicable, are disclosed above.  There are no terms sought to be filed under seal.**

(iii) Local Rule 4001-2(a)(i)(C) requires the disclosure of provisions that specifically limit the Court's power or discretion to enter future orders in the case.

**None, except those future orders that are inconsistent with the DIP Orders.**

(iv) Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that provide for the funding of non-debtor affiliates with cash collateral or proceeds of the loan, as applicable, and the approximate amount of such funding.

**The Approved Budget includes receipts and disbursements by the Debtors' foreign subsidiaries as set forth therein.**

(v) Local Rule 4001-2(a)(i)(E) requires disclosure of material conditions to closing and borrowing, including budget provisions.

**The material conditions to closing and borrowing are summarized above and set forth in detail in the DIP Term Sheet.**

(vi) Local Rule 4001-2(a)(i)(F) requires disclosure of any carve-outs from liens or superpriority claims, including the material terms of any professional fee carve-out.

**The provisions of the Carve-Out are set forth above and in the Interim Order. Interim Order ¶ 35.**

(vii) Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for postpetition liens on unencumbered assets, including the identification of such assets.

**The DIP Liens shall not extend to, and the DIP Collateral shall not consist of, avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or applicable state law equivalents, but (subject to entry of the Final Order) shall include the proceeds therefrom.  Interim Order ¶ 5.**

(viii) Local Rule 4001-2(a)(i)(H) requires disclosure of provisions that establish any sale or plan milestones.

**The DIP Milestones are set forth in <u>Exhibit B</u> to the DIP Term Sheet.**

(ix) Local Rule 4001-2(a)(i)(I) requires disclosure of provisions that provide for a prepayment penalty or other provisions that affect the debtor's right or ability to repay the financing in full during the course of the chapter 11 case.

**Prepayment provisions are set forth above and in the DIP Term Sheet.**

(x) Local Rule 4001-2(a)(i)(J) requires disclosure of provisions, in jointly administered cases, that govern joint liability of the debtors, including any provisions that would cause one jointly administered debtor to become liable for the prepetition debt of another jointly administered debtor for which it was not previously subject to.

**No provisions of the proposed DIP Orders or the DIP Term Sheet make any debtor liable for any prepetition debt of another debtor for which it was not previously liable.**

(xi) Local Rule 4001-2(a)(i)(K) requires disclosure of provisions that require the debtor to pay an agent's or lender's expenses and attorneys' fees in connection with the proposed financing or use of cash collateral, without any notice or review by the Office of the United States Trustee, the committee appointed under section 1102 of the Bankruptcy Code (if formed) or, upon objection by either of the foregoing parties, the Court.

**The provisions regarding payment of the fees and expenses of the DIP Agent and the DIP Lenders are disclosed above and in the Interim Order. Interim Order ¶ 38.**

(xii) Local Rule 4001-2(a)(i)(L) requires disclosure of provisions that prohibit the use of estate funds to investigate the liens and claims of the prepetition lender.

**The Interim Order provides for up to $25,000 for a Committee, if any, to investigate the claims and liens of the Prepetition Term Loan Secured Parties. Interim Order ¶ 35(i).**

(xiii) Local Rule 4001-2(a)(i)(M) requires disclosure of any termination or default provisions concerning the use of cash collateral or the availability of credit.

**Default and termination provisions are set forth above, in the Interim Order, and in the DIP Term Sheet. Interim Order ¶¶ 32–34.**

(xiv) Local Rule 4001-2(a)(i)(N) requires disclosure of any provisions that grant cross-collateralization protection or elevate prepetition debt to administrative expense (or higher) status or that secure prepetition debt with liens on postpetition assets (which liens the creditor would not otherwise have by virtue of the prepetition security agreement or applicable law).

**The roll-up provisions are set forth above and in the Interim Order and the DIP Term Sheet. Interim Order ¶ 8.**

(xv) Local Rule 4001-2(a)(i)(O) requires disclosure of any provisions that apply the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise have the effect of converting (or "rolling up") prepetition debt to postpetition debt.

**The roll-up provisions are set forth above and in the Interim Order and the DIP Term Sheet.  Interim Order ¶ 8.**

(xvi) Local Rule 4001-2(a)(i)(P) requires disclosure of any provisions that immediately prime valid, perfected and non-avoidable liens existing immediately prior to the petition date or that are perfected subsequent to the petition date as permitted by section 546(b) of the Bankruptcy Code, in each case that are senior to the lender's prepetition liens under applicable law, without the consent of the affected secured creditors, and the proposed notice to be provided to such affected secured creditors.

**The proposed DIP Orders provide for the priming of the Prepetition Term Loan Liens.  Interim Order ¶ 6.**

(xvii) Local Rule 4001-2(a)(i)(Q) requires disclosure of any provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest, including, but not limited to, any official committee appointed in these cases, at least seventy-five (75) days from the entry of the initial interim order to investigate such matters or (ii) limit the Court's ability to grant relief in the event of a successful challenge.

**The proposed DIP Orders provide that any stipulations by the Debtors relating to the validity, amount, and priority of the Prepetition Term Loan Obligations and any estate claims against the Prepetition Term Loan Secured Parties, including any claims associated with the Roll-Up Obligations, are subject to challenges by parties in interest by no later than the date that is the earlier of (x) subject to entry of the Final Order, one business day before the hearing to consider approval of a sale of all or substantially all of the Debtors' assets, and (y) 75 calendar days following the date of entry of the Interim Order.  Interim Order ¶ 44.**

(xviii) Local Rule 4001-2(a)(i)(R) requires disclosure of any provisions that immediately approve all terms and conditions of the underlying loan agreement (provided that provisions in the order that provide that the debtor is authorized to enter into and be bound by the terms and conditions of such loan agreement do not need to be summarized).

**The DIP Documents and the authority of the Debtors to enter into same are approved upon entry of the Interim Order, except as to certain provisions that are only approved upon entry of the Final Order.  Interim Order ¶¶ 2–3.**

(xix) Local Rule 4001-2(a)(i)(S) requires disclosure of any provisions that modify or terminate the automatic stay or permit the lender to enforce remedies following an event of default that do not require at least five (5) days' written notice to the trustee or debtor in possession, the Office of the United States Trustee and each committee appointed under sections 1102 and 1114 of the Bankruptcy Code (the "Remedies

Notice Period"), prior to such modification or termination of the automatic stay or the enforcement of the lender's remedies.

**Termination of the automatic stay to enable the DIP Agent and the DIP Lenders to enforce remedies is subject to a five (5) day Remedies Notice Period. Interim Order ¶ 32.**

(xx) Local Rule 4001-2(a)(i)(T) requires disclosure of any provisions that seek to limit what parties in interest (other than the debtor) may raise at any emergency hearing scheduled during the Remedies Notice Period.

**Not applicable.**

(xxi) Local Rule 4001-2(a)(i)(U) requires disclosure of any provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, and 548 of the Bankruptcy Code or, in each case, the proceeds thereof.

**Liens on proceeds of Avoidance Actions are effective only upon entry of the Final Order. Interim Order ¶ 5.**

(xxii) Local Rule 4001-2(a)(i)(V) requires disclosure of any provisions that immediately waive the debtor's rights under section 506(c) of the Bankruptcy Code.

**Section 506(c) waiver is effective upon entry of Final Order. Interim Order ¶ 47.**

(xxiii) Local Rule 4001-2(a)(i)(W) requires disclosure of any provisions that immediately seek to affect the Court's power to consider the equities of the case doctrine under section 552(b)(1) of the Bankruptcy Code.

**Equities of the case waiver is effective upon entry of Final Order. Interim Order ¶ 49.**

(xxiv) Local Rule 4001-2(a)(i)(X) requires disclosure of any provisions that immediately shield the lender from the equitable doctrine of "marshalling" or any similar doctrine.

**Marshaling waiver is effective upon entry of the Final Order. Interim Order ¶ 48.**

**D.    Need for Financing and Use of Cash Collateral**

22.    As described herein, the Debtors have an immediate and critical need to use Cash Collateral and obtain the DIP Facility to, among other things: (a) pay the fees, costs, and expenses incurred in connection with these chapter 11 cases, (b) fund any obligations benefitting from the

Carve-Out, (c) permit the orderly continuation of the operation of the Debtors' businesses, (d) maintain business relationships with customers, vendors, and suppliers, (e) make payroll, and (f) satisfy other working capital and operational needs.  The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers requires the availability of working capital from the DIP Facility and Cash Collateral, the absence of which would immediately and irreparably harm the Debtors, their estates, and parties in interest.  The Debtors do not have sufficient available sources of working capital and financing to operate their business in the ordinary course throughout these chapter 11 cases without access to the DIP Facility and authorized use of Cash Collateral.  In the absence of the DIP Facility and the use of Cash Collateral, the Debtors' business and estates would suffer immediate and irreparable harm.  Access to the DIP Facility and Cash Collateral will provide the Debtors with sufficient working capital and liquidity to operate during these chapter 11 cases and is vital to the continuation of the Debtors' ongoing sale process.  Without access to the DIP Facility and Cash Collateral, the Debtors would run out of money and their ability to maintain operations and value will be significantly impaired.

23. The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1)–(3) of the Bankruptcy Code without granting to the DIP Secured Parties the DIP Liens and the DIP Superpriority Claims (as defined in the Interim Order), in each case subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in the Interim Order and the DIP Documents.

**Basis for Relief**

I.    **The Debtors Should Be Permitted to Obtain Postpetition**
     **Financing Pursuant to Section 364(c) of the Bankruptcy Code**

24.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of this title as an administrative expense."  11 U.S.C. § 364(c).

25.    In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

    a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;

    b.    the credit transactions are necessary to preserve assets of the estate;

    c.    the terms of the credit agreement are fair, reasonable, and adequate;

    d.    the proposed financing agreement was negotiated in good faith and at arm's length, and entry thereto is an exercise of sound and reasonable business judgment and in the best interests of the debtors' estate and its creditors; and

    e.    the proposed financing agreement adequately protects the lender.

*See, e.g.*, *In re Aqua Assocs.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)).

26.    For the reasons discussed below, the Debtors satisfy the standards required to obtain postpetition financing in these chapter 11 cases on a senior secured superpriority basis as to the DIP Collateral under sections 364(c)(1), (2), and (d)(1) of the Bankruptcy Code.

II.    **The Debtors are Unable to Obtain Financing on More Favorable Terms**

27.    As described herein and in the First Day Declaration, the Debtors have carefully considered their financing options, and no alternative higher or better viable financing offers are available.  The Debtors have thus determined that the DIP Facility provides the Debtors with the best postpetition financing option available and should be approved.

28.    The Debtors respectfully submit that their efforts to obtain postpetition financing satisfy the standard required under section 364(c) of the Bankruptcy Code.  *See, e.g.*, *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (finding that, where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

III.    **The Proposed DIP Facility is Necessary**
         **to Maximize the Value of the Debtors' Estates**

29.    The Debtors seek to use the DIP Facility for general working capital purposes, ordinary business expenses such as payroll, and bankruptcy-related costs and expenses, in accordance with the Approved Budget, to maximize value through an orderly sale process.  The DIP Facility represents the best economic alternative for a new debtor-in-possession lending arrangement.

30.    Without immediate use of Cash Collateral and access to DIP Facility, the Debtors cannot continue to operate their business, which would irreparably damage the Debtors' efforts to effectuate a sale for the benefit of all constituents.  Accordingly, the Debtors request authority to access the DIP Facility and use Cash Collateral on the terms contemplated herein.

IV.    **The Terms of the Proposed DIP Facility, Including the**
         **Roll-Up Obligations, are Fair, Reasonable, and Appropriate**

31.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential

lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (stating that debtors may have to enter into hard bargains to acquire funds).

32.     The terms of the DIP Facility were negotiated in good faith and at arm's length between the Debtors, the DIP Lenders, and the Prepetition Term Loan Lenders, resulting in an agreement that is designed to permit the Debtors to maximize the value of their assets. The Debtors submit that the proposed terms of the DIP Facility are fair, reasonable, and appropriate under the circumstances. *See, e.g.*, *Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender); *In re W. Pac. Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing that would preserve the value of the debtor's assets). Further, the DIP Lenders consent to the DIP Facility on the terms set forth in the DIP Documents, and the Prepetition Term Loan Lenders consent to the use of Cash Collateral in accordance with the Interim DIP Order.

33.     As to the proposed roll-up of Prepetition Term Loan Obligations through the DIP Facility, the Debtors submit that such roll-up is fair, equitable, and in the best interests of the Debtors' estates and should be approved through the proposed DIP Orders. The Debtors' acceptance of the Roll-Up Obligations is a necessary component of the DIP Facility and is a sound exercise of the Debtors' business judgment.

34.     Courts in this district have regularly approved roll-ups made pursuant to new money debtor-in-possession financings, even on an interim basis, in recognition of the fact that such terms are often needed for chapter 11 debtors to secure favorable postpetition financing. *See,*

*e.g.*, *In re Synthego Corp.*, No. 25-10823 (MFW) (Bankr. D. Del. May 9, 2025) (interim order authorizing $5 million in new money loans and $10 million in roll-up loans); *In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. Feb. 14, 2024) (interim order authorizing $22 million in new money loans and $35 million in roll-up loans); *In re Nogin, Inc.*, No. 23-11945 (CTG) (Bankr. D. Del. Dec. 7, 2023) (authorizing $19.2 million of total financing through the interim order, inclusive of a refinancing of $8.5 million of prepetition debt); *In re Phoenix Servs. Topco LLC*, No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022) (authorizing $25 million in new money on an interim basis with an additional $25 million funding into escrow on an interim basis available for draw and a roll-up of approximately $75 million pursuant to the interim order); *In re TPC Grp. Inc.*, No. 22-10493 (CTG) (Bankr. D. Del. June 3, 2022) (authorizing $32 million in new money and a roll-up of $59 million pursuant to the interim order); *In re IM3NY LLC*, No. 25-10131 (BLS) (Bankr. D. Del. Feb. 28, 2025) (final order authorizing approximately $2.5 million in new money loans and a $15 million roll-up, reflecting a 6:1 roll-up ratio); and *In re Nine Point Energy Holdings, Inc*., No. 21-10570 (MFW) (Bankr. D. Del. Apr. 12, 2021) (final order authorizing up to $20 million in new money DIP loans and approximately $60 million in roll-up loans, reflecting at least a 3:1 roll-up ratio).

35.     For the Debtors to obtain the benefits of the DIP Facility, the Debtors and the DIP Lenders agreed to the terms of the Roll-Up Obligations as incorporated into the DIP Facility.  The DIP Lenders would not otherwise extend credit to the Debtors without such roll-up provisions. Accordingly, the proposed roll-up is an appropriate exercise of the Debtors' business judgment and should be approved.

**V.     The Carve-Out is Appropriate**

36.     The DIP Liens and DIP Superpriority Claims, along with prepetition liens and claims, are subject and subordinate to the Carve-Out, which contains similar terms to others that

this Court has found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from their advisors.  Without the Carve-Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated are restricted.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees.  Accordingly, the Carve-Out is appropriate and should be approved.

**VI.**    **<u>The DIP Secured Parties Should Be Deemed Good Faith Lenders</u>**

37.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

38.     The Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing.  All negotiations of the terms of the DIP Facility and use of Cash Collateral with the DIP Secured Parties and the Prepetition Term Loan Secured Parties were conducted in good faith and at arms' length.  The terms and conditions of the DIP

Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and in accordance with the proposed DIP Orders and the DIP Documents, including the Approved Budget. Any consideration being provided to any of the DIP Secured Parties is described herein. Accordingly, the Court should find that the DIP Secured Parties and the Prepetition Term Loan Secured Parties are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded thereby.

**VII.    The Proposed DIP Facility Reflects the Debtors' Sound Business Judgment**

39.    A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 (stating that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

40.    Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g.*, *Grp. of Inst. Inv'rs v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the debtor's business judgment); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."). Further, as one court has noted, "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

41. Bankruptcy courts generally defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.*, 163 B.R. at 974 (approving an interim loan, receivables facility, and asset-based facility based upon the debtor's prudent business judgment). Generally, courts will not second-guess a debtor's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513–14.

42. The Debtors believe that the economics underlying the DIP Facility are fair and reasonable and are consistent with, or better than, market norms. For these reasons and those set forth herein and in the First Day Declaration, the Debtors' exercise of their business judgment supports approval of the DIP Facility. Use of Cash Collateral and access to the DIP Facility will allow the Debtors to continue to operate, thus maximizing value for all of their constituents.

## VIII. <u>Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral</u>

43. Section 363(c) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless: "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

44. Here, the DIP Lenders and the Prepetition Term Loan Lenders consent to the use of Cash Collateral on the terms set forth in the Interim Order and to be set forth in the Final Order.

45. Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization

to use cash collateral only as is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g.*, *In re Simasko Prod. Co.*, 47 B.R. at 449; *In re Ames Dep't Stores Inc.*, 115 B.R. at 38. After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

46.     In order to continue operating and satisfy accruing administrative expenses, the Debtors require access to the DIP Facility and the use of Cash Collateral. Such use will provide the Debtors with the necessary funds to remain administratively solvent, while the Debtors pursue a value-maximizing sale of their assets.

47.     Absent access to Cash Collateral, the Debtors would face immediate and irreparable harm. The Debtors would likely be forced to cease operations and convert these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, leading to substantial destruction of value. Therefore, immediate access to Cash Collateral is essential to the Debtors' ability to maximize value for the benefit of all constituents.

### **Interim Order and Final Hearing**

48.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court schedule a Final Hearing within no more than thirty (30) calendar days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

49.     The urgent need to avoid immediate and irreparable harm to the Debtors' estates makes it imperative that the Debtors be authorized to access the DIP Facility and use Cash Collateral pending the Final Hearing, in order to allow the Debtors to operate and administer these chapter 11 cases on a postpetition basis. Without the ability to make draws under the DIP Facility

and use Cash Collateral, the Debtors would be unable to satisfy accruing postpetition obligations, including payroll, and would not be able to conduct a successful sale process, thus causing irreparable harm to the Debtors and the value of their estates. Accordingly, the Debtors respectfully request that, pending the Final Hearing, the Interim Order be approved and that the terms and provisions of the Interim Order be implemented and be deemed binding. The Debtors also request that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

50.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

51.     The Debtors will provide notice of this Motion to the following parties, or their counsel if known: (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Debtors' secured creditors; (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; (f) the United States Attorney's Office for the District of Delaware; (g) the state attorneys general for states in which the Debtors conduct business; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered on this Motion as required by Local Rule 9013-1(m).

**No Prior Request**

52.   No prior request for the relief sought herein has been made to this Court or any other court.

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order and, after the Final Hearing, the Final Order, granting the relief requested herein and such other relief as the Court deems just and proper.

Dated:   February 11, 2026          **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Mary F. Caloway*

Richard M. Pachulski, Esq. (*pro hac vice* forthcoming)
Mary F. Caloway, Esq. (DE Bar No. 3059)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone:     (302) 652-4100
Facsimile:     (302) 652 4400
Email:         rpachulski@pszjlaw.com
               mcaloway@pszjlaw.com

- and -

Gregory V. Demo, Esq. (*pro hac vice* forthcoming)
Cia H. Mackle, Esq. (*pro hac vice* forthcoming)
1700 Broadway, 36th Floor
New York, NY 10019
Telephone:     (212) 561-7700
Facsimile:     (212) 561-7777
Email:         gdemo@pszjlaw.com
               cmackle@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors-in-Possession*